Your argument next in numbers 21-2547 and 21-2576, It Re TransCare Corporation, Mr. Perry. Thank you, Your Honor, and may it please the Court. If I could start and perhaps finish with the damages awards in this case, which we submit should be set aside for two legal errors, two fundamental errors in their address and calculation. First, the courts below awarded damages without requiring the trustee to prove that the challenge transaction caused any harm to the estate, and I think it's important here to reflect on what the standard, the measure of damage is here, and everybody agrees. Under both theories of liability, the question is what the estate would have had had the transaction not occurred. That is the standard under Bamarco for the breach of fiduciary duty claim and under Madoff for the fraudulent transfer claim, and the trustee agrees with that standard in his brief at pages 59 and 66. So what would the estate have had if the transaction had not occurred? It would have had the assets. This was an asset foreclosure. This was a transaction that happened on February 24th after 20 days of chaos in which Ms. Tilton and her entities foreclosed on certain assets. Well, that's not really consistent with the Bankruptcy Court's findings, right? The Bankruptcy Court thinks it would have been operating as a going concern. Well, the going concern theory is how the trustee tried to fill the absence of harm, and I think it's important to separate them, Judge Manasci, into two separate questions. The first is did the estate lose anything as a result of the transaction? That is the question under fraudulent conveyance law and under fiduciary breach law. In fact, the Basho case, which the district court cited, makes very clear that the question is the change in value during the period in which the fiduciary held the assets, and it's important here. This is not a case of alienation of assets, destruction of assets, sale of assets. Right, so I think that that seems right, that the assets were not destroyed and probably didn't depreciate that much over the course of a couple days, but the main difference between the ex-ante value and the ex-post value is that it was no longer operating as a going concern, right? So that's true that ex-ante before the transaction, there were ambulances on the road, and the business was operating, right? It is true that there were. And in the very, I guess the very, very early days of transcendence, that was true also. Well, transcendence itself, after February 24th, was never operating, as the NLRB found in the Warnock case, and as the trustee, I don't think, has ever disputed. It certainly shut down no later than the 26th. But isn't your argument that actually, if you had made payroll, if the trustee didn't intervene either to stop the payroll from being executed or to prevent the server from being transferred to transcendence, then you would have kept ambulance drivers on the road, and the business would have been operating as a going concern, right? The bet, the effort that Ms. Tilton and her entities made was to turn these assets into a going concern, which did require access to the server. The server contained all of the routes, all of the pickup locations, drop-off times, all of the operational information regarding the paratransit service. The company could not operate without that. The trustee indisputably. Right, so then you're arguing, you were just arguing a moment ago, that actually it was never going to be a going concern, because it was always going to be liquidated. But isn't there, doesn't it also seem like you could infer from the record that actually, if you had made payroll at that moment, then it would have still operated as a going concern, and even after the transaction. Well, your honor, there's two separate points, and I'm obviously being inarticulate. And I guess your argument would be that the trustee caused it to stop operating as a going concern. The assets all ended up in the estate, right? The ambulances, the buildings, the material, the assets that were the subject of the foreclosure, the subject collateral as it's called in the papers, all ended up in the estate. It was the trustee's burden to show that it had less value on March 10th when it was transferred to the estate than it did on February 24th at the date of the foreclosure. That was his burden to prove. He failed to prove, there's no evidence of that. So your client effectively paid $10 million for the subject collateral. Why isn't that evidence of, obviously not a going concern value, but some version of a book value? It's a future value, your honor, as the court found, and we accept that finding. It was an effort by Ms. Tilton, who had run this company since 2002 or 2003, who was personally invested in it over years of operations, knew many, many of the employees this operation employed, more than 1,000 people. She had advanced in the period up to the bankruptcy more than $9 million either personally or through her funds that she never got back to try to keep this thing alive day to day. She was determined to save these jobs and to try to make it work. She had a vision for it that ultimately didn't fly, right? She threw a Hail Mary pass and it was incomplete. That is the facts. The question then is, did the estate suffer any harm? Because this is a liquidating- To Judge Menasche's initial point, as a factual finding, the subject collateral was deemed a going concern. I suppose you could ask at what relevant time period. Obviously not by the time the assets are transferred back to the estate, but at the time that the Tilton plan is developed and presumably at the time of the transfer. We have a fact finding that it was a going concern, and that's the valuation for purposes of damages. Your Honor, I question the premise. I think we have a fact finding that, and it's a SA-129, and Judge Kaplan's opinion is the clearest place of this, that quote, Tilton did not show that a third subject collateral and to contribute the new capital necessary to support a sale. The courts below put the burden on Ms. Tilton to disprove the existence of this white knife. So it isn't for breach of fiduciary duty, the fair price obligation, is that her burden? It was her burden to show that the price was fair. It was never her burden to disprove the existence of a mythical third party buyer. Her point always was this was not a going concern in the sense of a saleable business. These were a collection of assets that she believed that she uniquely could operate. So you don't dispute that it was a going concern in a literal sense. It was actually an operating business, right? Your argument is just that she is the only one who could have operated it. That actually it couldn't have been sold to anybody else. And that she was uniquely positioned because she knew the business and was invested in it. And therefore she was willing to plow more money into it without doing due diligence or other things to do an acquisition. And so it was literally a going concern, but it was only a going concern with her. And any alternative would have been a liquidation. Precisely, your honor. Well, the district court does say, so you're saying you put the burden on her. But the district court thinks, well, the fact that she was willing to operate it as a going concern leads to an inference that there could have been some other buyer who would have done that. And she doesn't really explore this possibility. She determines that they aren't available. And so he says, well, given the inference that it was in fact going to be operated as a going concern and she was willing to put ten more million dollars into it and so on. Suggests that somebody else might have been able to do that. And so she hasn't shown why that inference is not plausible. It's not putting the burden on her exactly, right? He has that initial inference. It is putting the burden on her, your honor. First, the bankruptcy court at SA 43 made the factual finding that everything up to February 4th was done in good faith, including the evaluation of the inchoate offers that were received in 2015. And rejected, the trustee had an alternative theory that she failed to maximize the value of the assets. So that theory was entirely rejected. So the only question left was during the 20 days of chaos, February 5th to February 24th, could and would the assets have been sold to a third party buyer for $40 million plus a capital infusion plus extinguishment of the debt? That was the trustee's burden. And the inference the court just described, which the trustee, of course, leans very heavily on in his brief at page RB, you know, the red brief 64. It was not unreasonable for the district court to infer that a third party buyer would have been there. We actually, that is the legal error. It was the trustee's burden to show that the alternative was a sale rather than liquidation. This whole enterprise was headed into chapter seven. It was never going to operate as a going concern. The alternative was not a sale, unless the trustee could prove the mythical white knight. The alternative was liquidation, which happened. And- So the evidence that's there is evidence that there were some buyers who were interested before, and there's evidence that Tilton herself was willing to operate as a going concern and put in additional money. Why isn't that enough evidence to suggest that there could be a buyer? So why do we have to show that there's a specific, why does there have to be a show that there's a specific person that was going to make an offer? If in fact the record shows that she forbade her staff from exploring on her offers, then you wouldn't have such evidence. There wouldn't be an offer on the table, but the evidence around it suggests that there could have been. Two undisputed reasons, your honor. First, there are no financials for this company in February of 2016. The last audited financials are 2013. Karl Marx, which was hired in consultation with Wells Fargo as the third party advisor, specifically to clean up the books of the company and prepare it for sale. That's the language of the contract with Karl Marx. Reported in January that it was unable to put the financials in order to even shop the company to a buyer or any of its assets. So there are no financials. No due diligence could possibly have been done. Second, we have a compressed time frame. We have a finding that everything up to February 4th was in good faith and not actionable. I see, so the argument is because you didn't have the financials in order that there just wouldn't have been a buyer. You couldn't do due diligence and you couldn't evaluate the company. No buyer. You couldn't operate for the period of months it would have taken to close the sale. No buyer. You're saying that based on that, that that counteracts any inference that maybe there was a buyer available. Correct, your honor. The facts on the ground, the 20 days between February 5th and February 24th, no third party buyer could have done due diligence and closed the transaction. You just can't close a transaction in 20 days. It's not possible. Can I go back to the going concern thing? So I was suggesting before, you had this argument that it was going to be liquidated anyway, and that's why she didn't cause any damage. What if, is there also an argument that, well, it was operating as a going concern because she was operating it. So if the trustee came in, if let's say you had made payroll, like let's say you had accounted for the server, it was located at Transcendence, or you had raised the additional $200,000 for whatever reason, you had made payroll. So in fact, there was no need to fire all the drivers, and so Transcendence would have been operating as a going concern. If in fact it was a fraudulent conveyance, I suppose the trustee could have avoided the transfer of Transcendence to away from the estate. It could have become part of Transcare, and then it would have captured Transcare as a going concern, right? And so there wouldn't have been a diminution in value, right? So don't you also have an argument that actually the transaction itself didn't cause the lack of going concern value? It was the intervention of the trustee? Yes, Your Honor. And- So if that's what it is, I mean, so first of all, I guess that my question is, isn't that at odds with your suggestion that the liquidation was inevitable, if that's a possibility? And second of all, if the intervention of the trustee is a cause, what do we do with that? How do you calculate damages in that kind of situation? So, Your Honor, my point is that the company was on the path to liquidation, and Ms. Tilton threw a Hail Mary pass, right? It was never guaranteed to succeed. It was a bet. It was a risk. And the question is, does bankruptcy policy and fiduciary policy encourage owners, insiders to take those risks to try to avoid litigation and save jobs, or to put everything into chapter? Because if she had sat back and done nothing, the whole thing would have gone into Chapter 7. It all would have been liquidated, and we wouldn't be here today. There's no dispute about that, right? It simply would have slid into liquidation. Then the question is, and my point on inevitability is this, it is that the choice is between the transaction as it occurred and liquidation. It's not the false choice that the trustee has hypothesized but never proved between the transaction as it occurred and sale to a third party. I get that. I'm just interested in the idea that maybe the cause of it not operating as you're concerned is the trustee's intervention or the payroll. Two specific points on that. First, the trustee, by March 10th, received all of the assets. Whatever they are, he received them. In other words, whether they were a going concern, simply assets, a bucket of nails, it doesn't matter. Everything that was foreclosed on on February 24th was transferred to the trustee untouched, unharmed, untampered with, undiminished by March 10th so that whatever it is, a going concern or a bucket of nails, he got it and he had to prove a change in value. Second, as to the interference with the going concern, the effort that Ms. The trustee knew about and consciously interfered with, right? He said, you can't do it. I'm going to not give you the server, I'm going to not give you the drivers. The MTA contract got interfered with over that 48 hours, and he made it impossible for it to be a going concern. So that if there was a future value, and I think that's important, that word that Judge Kaplan used. It's not actual value or present value, it's future value. The future value that Ms. Tilton recognized and was willing to invest in, invest her own money in. Does it have present value? Like if it is a business that's going to be profitable, then somebody would want to buy it then, right? I mean, that's the way businesses work. There's clearly no present value in TransCare as a whole. The findings of fact are very clear on that. And there is no present value. But there are the lines that were operating under TransCare. Well, there's not lines, Your Honor. The trustee calls them lines and divisions. There are assets. There's 157 ambulances, right? Again, I mean, that's the determination that the subject collateral was a going concern and had value. And by the time it comes back to the estate, it gets liquidated. So the change in value is the determined going concern value at the time of the transfer minus the liquidation value. And if that is the theory, and again, I understand that the trustee makes that argument at pages 59 and again at 68 of his brief. What happened between February 24th and March 10th? Ms. Tilton tried to operate the company. The trustee wouldn't give the servers. The trustee wouldn't let her pay the drivers. The contracts canceled. Three canceled before February 24th by third parties. These were all short-term, terminable contracts. The point you're making is, well, okay, it was just a couple days, and then they got all the assets back. Correct. And so they got all the assets back. But so, I think you'd acknowledge that if, in fact, during those couple days they beat up all the ambulances and destroyed their value, that she'd have to compensate the estate for that value. So if she, in fact, was responsible for the business operating as a going concern at the beginning of the couple days, and then it was not a going concern at the end of the couple days, she's also had to compensate them for that. So I guess my question is, and I see this point, that it's not totally obvious that it's the transaction that's responsible for operating as a going concern, is what should the bankruptcy court have done? An inquiry into whether it would have operated if the payroll had been met, whether the trustee was making a reasonable decision and not surrendering the server? What would it look like? So, three issues. First, the court never held the trustee to show what was the cause of the so-called diminution of value, right? What is the difference in value between February 24th and March 10th? Why is February 24th the start date of the time frame as opposed to beginning of February when the Tilton plan gets going? So February 24th is the actual foreclosure date, Your Honor. I don't think anybody's made an argument that there's a difference between February 5th and February 24th. I mean, it's 20 days, right? So I would say February, if that's better. The point is, between the date of the foreclosure on the 24th and the transfer of the assets to the 10th, it was the trustee's burden under both fiduciary law and fraudulent conveyance law to show a diminution of value. And the judge, there are no findings in this record to show the value on those dates other than the assumption that it would have been sold to a third party, right? There's no actual valuation of the entity. Second error is that on the assumption it would have been sold to a third party, the court held Ms. Tilton liable for the entire diminution from the supposed $40 million at February 24th, or in February, to March 10th. Ignoring the trustee's own role in denying access to the server, third party's role in canceling the contracts, and so forth. That made it impossible to work as a going concern. And the question is, what of that is attributable to the fiduciary rather than to the world at large? And that inquiry was never undertaken, even though the Delaware cases are clear, you have to look at what the fiduciary's context is. And the third, I think this is, you know, it sort of combines the first two. The trustee had to show that at the date he had all the assets in his hands. And remember, small detour, if it was a going concern, the trustee could have operated as a going concern, right? If the assets had that same value, he had the assets. He had the server. He had the contracts. He had everything. If it had that value, nothing Ms. Tilton did took it away from the trustee. So that the ultimate- Let me just ask that question, I guess, a little bit more directly. So it is true, so like, in those couple day period, it did start out, they had drivers on the road, and it was an operating business. At the end of the period, the drivers were terminated, and it was not an operating business. No, your honor. The drivers never went on the road. The assets were foreclosed on February 24th. So the drivers for whom, well, maybe they weren't on the road. Never as transcendent. But they were employees, right? They were employees. I think the bankruptcy court actually says there were drivers on the road, 48 emergency ambulances that were on the road, and drivers needed to be paid. And they were all directed to return them to the nearest firehouse or safe, secure location, because they contained narcotics and drugs. They did- After the termination was made, that's the main payroll. So before that- That's on the 25th, though, your honor. Remember, this happened- I get it, okay. It's immediately. So in the brief period before that happens, you have drivers on the road. There's an effort to make payroll. There's a $200,000 shortfall. The trustee doesn't want to pay without doing the whole amount, doesn't want to operate without doing the whole amount. Then there's an effort to get the server, because transcendence would try to make payroll, and it doesn't release the server. Then, after that happens, the drivers are terminated, right? Correct. So before that happens, there was a fleet of drivers. Maybe they weren't literally on the road, but they were employed. Right, and so it wasn't operate, it was like a business. No. And so I guess my question is, and I thought maybe it was an argument that you were making, and so maybe it was not a hostile question, which is, whose fault is it that the drivers ended up being terminated? Because it does seem like the reason that they were terminated, and it was not an ongoing business, is because of this fight over making payroll and possession of the server, as opposed to anything inherent to the transaction. I agree with all of that, your honor. There's two pieces to it. First, which entity was the employer actually was litigated before the NLRB? That was the Warnock litigation. We've cited that in our papers, right? And the NLRB, ALJ, and the board found that the employees never transferred to Transcendence, and that Transcendence was never an operating company. So there was no going, Transcendence never started, because of, part two to my answer, is the refusal to turn over the server, the unwillingness to make payroll, and the unwillingness to work on the MTA contract. All of which Judge Kaplan found, by the way, at SA119 and 20, and footnotes 58 and 59, are actions the trustee voluntarily made upon assuming the bankruptcy estate, and that prevented, on the very first day, right, when the sun came up that morning, Transcendence could not operate because of decisions made by the trustee. So that, you know, we don't think there ever was a going concern in the sense that Judge Kaplan used that term, but certainly there was not the next day, because the trustee would not allow it to operate. And then he turned around and sued for that value, and it was his burden to show that Ms. Tilton caused any diminution. But, you know, there is a point in causation law, and we keep coming back to causation, that any diminution was actually caused by the actions of the trustee. This is not a criticism, it's actually a reflection of the fact that his job, he's a liquidating trustee, right, under Section 704 of the Code, his only job is to collect all the assets and auction them off at liquidation value. He did that. So this whole notion of a going concern, or these kinds of damages, have really no place in the Chapter 7 bankruptcy. And the theory being advanced is disconnected from the actual conduct on the ground. It is a hypothetical scenario rather than an actual scenario. Okay, I think we have that argument. You have reserved time for rebuttal, so we'll hear from you again. Thank you, Adam. But let's turn to the appellee, Mr. Phillips. Good morning, Your Honors. And may it please the Court, I'm Carter Phillips. I represent the trustee in this matter. It does not come as a great surprise to me that my friend, Mr. Perry, begins with a focus on the damages in this case. Because it seems to me that the liability in this case is pretty remarkable. I mean, we're talking about a transaction in which there's no doubt that Ms. Tubman had a fiduciary responsibility to the corporation's shareholders, and she breached that duty completely. She engaged in a completely interesting transaction in which she was on all sides of the deal and put aside, and as the district court said, she took all of the most valuable assets of this estate, put them in a separate corporation, free and clear of the debts that would otherwise exist, and purchased those assets for an amount that she chose out of the sky. Certainly no more than the book value, but in any event, she picked a number, attached to it, arranged sort of haphazardly. If the facts were as she suggests they were, that this was the only option for the business to continue, and the creditors were not going to get, or the shareholders, or the creditors were not going to get anything better than this. Then she would not have the requisite intent, but you just disagree that that's what the situation was. Well, that goes to why the entire fairness inquiry in the Delaware law requires this, right? We look at the process. How fair was the process? Did she make any of the inquiries that you would normally have made? I can understand not accepting the first offer that somebody makes to you months before you get into a period of desperation. I can maybe understand not responding to the second, or the third, or the fifth. The truth is she had more than ten offers unsolicited to purchase a variety of these. She made no effort, once she got it in her mind that she was going to adopt the Tilton plan, to see if anybody else would be interested in that. If she had done that, and if all of those had fallen through, either because of, you know, inability to do due diligence, et cetera, that would be one thing. She did none of that. She picked a price out of the air and decided to go forth on that basis. Now, the fundamental question on causation is what happened in that very short period of time? Right, so then I guess that's the question that I was focusing on before. So it does seem to me the idea about damages is, well, before the transaction, it was a going concern. At least that's what the bankruptcy court finds. There's a dispute about that, I guess. And then after it was returned to the trustee, it was sold for liquidation value because it was no longer a going concern. Right. And so the question is, what caused the lack of a going concern? Now, I don't think you disagree that if, in fact, she had succeeded, let's say that they had made payroll, that they had accounted for the server in advance and whatever, and Transcendence was operating, and there were ambulances on the road. And then maybe the trustee comes in, he could avoid that transaction. And then so then TransCare could get back Transcendence as a going concern. Right. There wouldn't be damages, right? Because actually, he'd have all the assets, it'd be operating as a going concern, and it wouldn't be that hard. Right. Of course, the flip side of that is- The problem is that the change from a going concern to not a going concern. Right. And so I guess my question is, did the transaction really cause it? I mean, the transaction put the company in a better place to keep going, right? What caused it was this fight over the payroll that required the termination of the driver. No, what caused it was the cancellation of the MTA agreement. That was the key because that, frankly, was a source of significant revenue to the Transcendence business and would have allowed it to go forward. And that was a unilateral decision by Ms. Tilton. I mean, she could have left, negotiated, could have gotten that server, if she'd made any efforts to get around any of those kinds of, those were all details. She, at 7 o'clock on that night, said, we're done. We don't know why that happened, why she chose that. But once you take that deal off the table- That's actually not the breach of the fiduciary duty or the fraudulent conveyance, right? For which the court is awarding damages, right? That is something that happens subsequently. Right, but once you breach the fiduciary duty and you put yourself into this position, you've now got an asset that should belong to the estate. And the one thing you don't have the authority to do is to destroy the value of that asset by taking a unilateral action under those circumstances. It'd be the same as if she had done that and then she burned it down. I don't think, that's exactly the same thing. She unilaterally brought this to a close when she gave up that deal. If she had burned down the assets, wouldn't you have brought a case that says that burning down the assets was the breach of fiduciary duty, not the transaction? No, but you would just say, if the concern is where is the causation element? Is it foreseeable that if you go into this into an ongoing concern that a party who should have every interest in trying to pursue this decides either as a matter of peak or some other reason to just cancel it all together, what she took away was the right of the- Cancellation not because they couldn't pay the payroll, and so they couldn't pay the drivers? Well, I find it extraordinary that Mr. Perry says that her entire concern here was the well-being of all of these employees. She was $200,000 short of being able to make the payroll and to continue to move on. I think all of these actions that arose at the point in time when she was trying to get transcendence moving as part of an ongoing concern are frankly trivial except for the cancellation of the MTA agreement. Because the MTA agreement by itself is almost adequate to get you to the ultimate damages number. Because that was going to pay tens of millions of dollars in revenue on a $4.1 million times 10.1. And you're at the number that was assigned to it. It's a perfect match. That's the problem. She- Didn't the transaction itself put Transcare slash Transcendence in a better position to fulfill the MTA contract? Because they could keep drivers on the road and unencumbered by their debts? Yeah, of course. But that's the- It should have done. That was her plan. But before she decides to sell that to herself at a price she picks, she should have made overtures. She should have sought others who might have been willing to do it and could have done it more efficiently. I mean, the truth is she may well know that business better in the sense that she studied the specifics of that company. But there are a lot of other businesses and many of them made unsolicited offers of very significant amounts. Why? Because they actually operate in those markets and they understood the value of that MTA contract. And how that would drive the going forward value of that property. And what was taken and what the trustee is saying needs to be given back to the estate was that fundamental lost opportunity. Well, the calculation by the bankruptcy court is not about the value of the MTA contract, right? It is about more than that. I'm sorry, I missed the first part. The damages are not just the loss of the MTA contract, right? No, no. It's a subset of the valuation. Right, all I'm saying is that if you did just the MTA contract, that by itself would frankly justify the number. But the expert went through it very carefully. I mean, there are three divisions. He may quarrel with divisions, but three separate units of it, and each one valued in a particular way. I mean, we should be clear about it. There's no question that she thought she had a going concern operation coming with those three. I mean, the statement to the insurer is at least worth quoting it once during this. As she says, under this arrangement, there'll be 79 million in revenue, 7 million of EBITDA in 2017. I would be providing all of the new working capital for the business myself personally. Why? Because this is money I can invest in, because this is an operation that's going to make money. That was her vision. So what about the argument that actually she was the only one in a position to do that? Because any other buyer would have required financial statements in a month's long period to do due diligence and so on. That's the only way it was going to be a going concern is under her. That would come far better from someone who actually made any inquiries. From anyone, rather than to say to every employee who works for you, you're not selling my businesses. You're not making any of those overtures. If that were true, would you agree that actually that should not have been valued as a going concern, if in fact the only way it could be a going concern was under this one person? If she could have proven, as part of her entire fairness exercise, that she had followed a fair process, yes, that would be true. But she didn't follow a fair process. She had the opportunity. I realize things were moving quickly, but you have unsolicited offers. You know exactly who to call. It's not like there hadn't been contacts. You have a lot of employees. You send them out, you find out what the opportunities are, and then you come back. What you don't do is say, you know what? I'm going to strip out the best assets, I'm going to keep them for myself, and we're going to run and run with them. Okay, so again, the hypothetical I mentioned before, putting aside the question of whether there's a breach or fraudulent conveyance. If in fact, they had met payroll, and so the drivers were not terminated, there were drivers on the road and transcendence was operating. I suppose the trustee could have come in and avoided the transfer to transcendence and recaptured it. Of course. And would have captured all the assets as a going concern. Right. If we were in that scenario, then there would not be damages, right? Because there wouldn't be a diminution in value from the transaction. Well, it depends, I suppose, on whether or not they actually implemented it consistently. There could still be a delta in there somewhere, but yeah, in truth, I don't think there would be, but that's- When I look at it, the problem is not the transaction itself. The problem is the termination of the drivers and the fact that it was no longer a going concern. Well, it's the termination of the contract, which is, I'm going to be clear, but I realize the termination of the driver is how you end up, but it was the announcement that we're not doing business with the city of New York any longer. That was the key component of this, but that was her choice made. And once you place yourself in this fiduciary situation, you have an absolute obligation to maximize the value of that property that you now put into your own grasp. And once you take this action to reduce that value from 38 million, there's around 38 million, down to 1.2 million, that's how I view it. Okay, so I take your point that maybe the real problem is the termination of the MTA contract, but I guess I just, so that you could treat it as a hypothetical. So if, in fact, the problem was the failure to make payroll, which required terminating the drivers, if the trustee played a role in that, should the district court have evaluated whether actually the transition from a going concern company to a not going concern company was attributable to the transaction? The bankruptcy court doesn't actually do that, right? The bankruptcy court says this is a fraudulent advance for a breach of fiduciary duty, and it talks about damages in terms of what the value was before and the value was after. But it doesn't consider whether there's some other cause to the diminution of value. So if you focus on the MTA contract, if the MTA had itself imploded or went out of business or something, or shut down, it wouldn't be her fault that the MTA contract was terminated, right? So that would be an intervening cause. Might be, yeah. So shouldn't the district court have, or the bankruptcy court have evaluated whether the loss of value was attributable to the transaction or the breach? No, I don't think it makes any difference, because the fundamental point with breach of fiduciary duty is that the risks all fall to the party that breaches the fiduciary responsibility. And once you go down that path, you bear the burden or risks that things don't turn out the way you want them. And the particular risk, it seems to me, as a matter of bankruptcy policy, you do not want to encourage, is to engage in this stripping exercise and then allowing the person to cancel in the middle of the deal, destroying the total ongoing, the going concern value that she acknowledged existed, simply as a matter of peak or whatever it was that caused her to do that. I think the court should say, no, that's not what we would do in Delaware. That's not the way bankruptcy law ought to operate. And the bankruptcy judge and the district judge got that absolutely right. So if you breach and then it causes problems, I mean, the results have to be foreseeable, right? Yeah, of course. So if the trustee acted irrationally and did something to sabotage transcendence, then it might be that there's an intervening clause. You just said that the record doesn't show that here. No, obviously the record doesn't show that, and my friend doesn't even challenge that the positions that he took weren't legitimate. Obviously, but you're not going to give up the server with all of the records and documents of the business without having some protections built into it. You're not going to pay payroll when you don't have any money at all because of what's been handed to you. I mean, every decision the trustee made was completely legitimate and valid. And all of this could have been negotiated through, I'm sorry, she just decided for whatever reason, this contract's over, once that ended, transcendence died. That's what killed transcendence, we all know that's true. And that's the reason why she's on the hook for the lost value to the estate. If there are no further questions, your honors, I'd ask you to affirm. Thank you. Okay, thank you very much, Mr. Phillips. Let's turn back to Mr. Perry on rebuttal. What I heard my friend, Mr. Phillips say is that the cancellation of the MTA contract caused all the damages because he had no other argument on damages. Let's unpack that a little bit. First, the MTA contract was held by TransCare New York, a company that went into Chapter 7 bankruptcy by this trustee and was held by this trustee during, on February 25th when the contract was canceled. The trustee owned that contract. Second, and that's at page SA 34, by the way, of the record. Second, the restructuring plan offered no value to the MTA contract. You know, the trustee criticized Ms. Tilton for that before. Ms. Tilton explained on the stand that the contract was terminable at will. She wanted to operate a paratransit business. She had the assets to do that, but it was not guaranteed. Third, it was not transferred. It was never transferred to Transcendence. Ms. Tilton, the entity that is accused here, the transaction, never had the MTA contract because the trustee, first, wouldn't agree to the transfer, and second, conditioned the transfer. And so we have once again- Conditioned the transfer quite reasonably on there being no prejudice to TransCare getting its accounts receivable, right? Of course, they owned the receivables. They wanted the right to go after more. The deal broke down, as they do, and again, this is not- I'm saying Transcendence didn't own the contract, but in fact, there were negotiations with the MTA over Transcendence performing under the contract after the transaction, right? So it is the transaction that meant that they weren't going to end up performing under the MTA contract. Well, under the transaction, your honor, the contract, to be clear, was owned by the trustee. So it's not within the subject collateral. The MTA contract is not part of the subject collateral. But Tilton did make a decision and told the MTA, we as Transcendence are not going to operate under a short-term contract with the city. And so we're just repudiating, or not interested in performing the MTA contract. Well, your honor, I think it's important to put the timeline in. That discussion came after the trustee refused to turn over the server, after the trustee refused to let the drivers drive, and after the trustee first dragged his feet for a day and wouldn't agree to the transfer of the contract. So that by the end of the second day, and remember, this all happened in 48 hours. By the end of the second day, there was nothing to be done, and therefore, no reason to continue the negotiations. But the subject collateral never included that asset. I mean, the one thing, the one specific thing that Mr. Phillips identified in this court as the cause of the damage, was not property of the, was not part of the subject collateral. I mean, I don't even understand how that would work. Finally- Did Ms. Tilton have authority to cancel the MTA contract? Your honor, it was canceled by the MTA. It was not canceled, TransCare New York, the party to it, had certain cancellation rights. I think there was a time period, but it was not by any of the entities within the subject collateral, the divisions that were, you know, the units that were within the subject collateral. It was canceled by the MTA after Transcendence said you should cancel your contract with TransCare so that you could perform it with us, right? Well, they wanted to transfer the contract, to be clear. They wanted to transfer the contract to the new Transcendence entity, and that transfer never took place. They, TransCare, wanted, or MTA, wanted to. I'm sorry, your honor, my they was very imprecise. Ms. Tilton and the new entity, Transcendence, wanted to transfer the MTA contract from the old TransCare New York entity, which was part of the estate, to the new Transcendence entity to offer paratransit services. That never happened. So, you know- And Mr. Phillips said it's inexplicable that maybe she just did it out of pique. So what is the reason why Ms. Tilton said we don't want to perform the MTA contract as Transcendence? Because there was no, Transcendence was smothered in the crib, your honor. By the end of the second day, there was no Transcendence. By the time she said we can't perform the MTA contract, it was because they couldn't make payroll and they had to fire the drivers. Correct, your honor. But you know, this all unfolded very quickly. The trustee refused to play ball, the bet didn't work, and that so- Just to be precise about how he refused to play ball. So they wanted to make payroll, there was a $200,000 shortfall, and he said, I'm not going to do payroll and operate it unless we can pay the drivers the full amount, and nobody wanted to contribute the $200,000. Correct. Including Tilton. Correct. And then there was an effort to get the server. If they had gotten the server, would they have been able to do payroll under the banner of Transcendence, or did they also just not have enough money at that time?  Your honor, the server had all the routes, all the pick up and drop off times, the names of the patients, the- So Transcendence just couldn't operate without the server. Could not operate without the server, and the bankruptcy court and the district court both found that. It was essential to the operation of Transcendence. The trustee, the very first thing he did was lock down that server and refused to give it over the morning of the 24th, the 5th. And so that was, they could not operate without the server, and he refused to give it. So everything that happened after that then was, what are we paying the drivers for? We don't have routes. We don't have pick ups. We don't have so forth. What are we having this contract for? Again, we don't have routes. We don't have drivers. So it was a cascading series of events that all was built on the trustee's determination to lock down the assets for a liquidation sale. So, you know, to end where I started, he got all the assets after the 48 hours, and the new entity never got off the ground, never did anything. It just, you know, was a paper transfer. The money was never transferred, by the way. The employees were never transferred. This was a paper transaction. All of the assets, this was an asset foreclosure. All of those assets were moved over into the bankruptcy estate, and he liquidated them in total for $19.2 million. It remains the trustee's burden to show that. For what, $1.2 million? Well, $1.2 million net for the subject collateral, $19.2 million total for all the assets. And there is no evidence, and we have made this point in every brief we filed, your honor. There is no evidence, no fact that says if the transaction had not occurred, the estate would have made any more than $19.2 million total, or $1.2 million net on the subject collateral. That's the fundamental problem with the damages case here, and for that reason, we think these damages need to be set aside as to both the entities and to Ms. Tilton. Okay, thank you very much, Mr. Perry. The case is submitted. And because that is the last case on our calendar for today, we are adjourned. Court is adjourned. Friends, likewise, likewise. Friends, likewise, likewise.